UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | 2:22-CR-131 |
| vs. | ) | |
| KANE FEE WRIGHT, | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

Defendant has filed a Motion to suppress all evidence seized during the search of his residence located at 351 Sewanee Avenue, Kingsport, Tennessee, which took place on December 19, 2021. [Doc. 14]. The United States filed a response in opposition to Defendant's motion [Doc. 19]. A hearing on the motion was held before the undersigned on April 27, 2023. Present at the hearing were Defendant and his counsel, Bryce W. McKenzie, Esq., and Assistant United States Attorney Emily Swecker. Officer Jared Hudgins, Officer Sarah Hutton, Lieutenant Steve Hammonds, and Detective Mike Slater of the Kingsport Police Department testified on behalf of the Government, and Michael Wright testified on behalf of Defendant. The matter is before the Court pursuant to 28 U.S.C. § 636 and the standing orders of the District Court. The matter is now ripe for resolution. For the reasons stated herein, the undersigned **RECOMMENDS** that the Motion to Suppress [Doc. 14] be **DENIED**.

I.  BACKGROUND

On November 9, 2022, a federal grand jury returned an Indictment [Doc. 1] against Defendant, charging him with one count of knowingly, intentionally, and without authority

possessing with intent to distribute 40 grams or more of a substance containing fentanyl, a Schedule II controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B); one count of knowingly possessing a firearm, namely a Smith & Wesson, model M&P Shield .40 caliber pistol, in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A); and one count of knowingly possessing the same firearm while being aware that he was prohibited from doing so because he is a convicted felon in violation of 18 U.S.C. § 922(g)(1).

In his Motion, Defendant argues that the search of his residence was unreasonable under the Fourth Amendment because it was conducted without a warrant and there was no applicable exception to the warrant requirement which would justify the search. [Doc. 14, p. 5]. Because he claims the search was unreasonable, Defendant contends that all evidence obtained as a result should be suppressed, including the firearms, illicit drugs, and drug paraphernalia seized, and the statements made by Defendant and Allister Wright. *Id.* at 4.

In response, the United States avers that law enforcement obtained valid consent before entering Defendant's residence and conducting a search. [Doc. 19, p. 1]. The Government further argues that even in the absence of valid consent, officers' need to enter the residence to perform a welfare check amounted to exigent circumstances which would justify a warrantless search of the residence. *Id.* at 4. Therefore, the United States contends Defendant's Motion should be denied.

## II. FINDINGS OF FACT

### a. Testimony of Officer Jared Hudgins

Officer Jared Hudgins ("Officer Hudgins") has been a patrol officer for the Kingsport Police Department ("KPD") for two and a half years and is frequently called upon to respond to calls involving drugs and overdoses. He had been a patrol officer for approximately one year

when the incident at issue took place. Officer Hudgins testified that on December 19, 2021, KPD received a call at approximately 1:40 a.m. of a possible overdose at 351 Sewanee Avenue, Kingsport, Tennessee. The call came from a third party[1] who reported that a male had overdosed, potentially on heroin. Officer Hudgins stated he was unaware of the identity or location of the caller who reported the overdoes and did not know how long before he was dispatched that KPD had received the call.

Upon receiving word from dispatch about the overdose call, Officer Hudgins and his partner, Officer Sarah Hutton ("Officer Hutton"), immediately proceeded to 351 Sewanee Avenue in separate patrol cars but arrived on the scene at the same time, about 5-10 minutes later. Officer Hudgins stated that he did not observe anyone outside the home when he and Officer Hutton arrived at the residence. Upon arrival, Officer Hudgins and Officer Hutton went to what appeared to be the primary entrance to the residence and knocked on the closed door, loudly announcing themselves as police. Officer Hudgins further advised that neither he nor Officer Hutton had their guns drawn, and while they knocked loudly and used a loud voice to identify themselves, their tone was non-threatening. He testified that less than 30 seconds elapsed before Defendant opened the door.[2] When he answered the door, Defendant did not appear to be under the influence and was coherent. Officer Hudgins advised Defendant they had received a call that someone in the home may have overdosed. Defendant reported that his brother, Alister Wright,[3] had overdosed but was now okay. Officer Hudgins said he then explained to Defendant that

---

[1] In this context, a "third party" is a person who is not at the scene where the reported incident is allegedly taking place.
[2] During the hearing, Officer Hudgins identified Defendant Kane Wright as the individual who answered the door.
[3] For clarity's sake, Alister Wright will be referred to by his first name in this Report & Recommendation, while Defendant Kane Wright will be referred to only as Defendant. Their father, Michael Wright, who testified at the hearing will be referred to as "Mr. Wright." No disrespect is intended to Alister Wright by the use of his first name alone.

despite the assurance that Alister was okay, he and Officer Hutton needed to physically lay eyes on Alister before they could leave. Officer Hudgins testified that while Defendant was initially hesitant about allowing him and Officer Hutton permission to enter the home, he did ultimately, and quickly, consent to them entering. Officer Hudgins was unsure if there was a written policy which required officers responding to a well-check call of this type to have direct contact with a reported victim, but he was taught during his training that it was required. He further explained that because this was a medical call, emergency medical services ("EMS") was simultaneously dispatched, making it important that the officers "clear the scene" to best ensure the safety of the responding emergency medical technicians ("EMTs").

Officer Hudgins stated that Defendant was inquisitive but cooperative during his interaction with him and Officer Hutton, and while initially hesitant about allowing them to come in, as referenced above, Defendant never denied officers permission to enter. Officer Hudgins testified that he and Officer Hutton did not cross the threshold of the home before receiving consent to enter, and they did not see anything illegal from the doorway before entering. Once inside the home, Defendant led officers through the kitchen and laundry room to a bedroom off the back hallway. Officers looked inside the bedroom and saw Alister lying on the bed under a blanket. He was awake and advised officers he was alright. Officer Hudgins testified that while checking on Alister, he observed drug paraphernalia and the barrel of a gun in plain view. The drug paraphernalia was on top of the bed and the gun barrel was sticking out from under the blanket that was covering Alister. Once he noticed the firearm, Officer Hudgins instructed Alister to move from the bed. At that time, a second firearm that had been fully concealed by the blanket was revealed. Officer Hudgins stated that he then secured both firearms by removing the ammunition from them. He went on to explain that he did not know whether Defendant or Alister

was legally prohibited from possessing firearms at the time he first observed them, but he was still required to secure the firearms for officer safety. Officer Hudgins testified that he did not see anyone other than Defendant and Alister Wright inside the residence while he was initially checking on Alister.

Once the firearms had been secured, Officer Hudgins advised that he visually scanned the bedroom and noticed an open Morton salt container with a baggie of what appeared to be heroin inside. Additionally, he saw baggies containing hallucinogenic mushrooms and marijuana.[4] After observing the illegal drugs in the bedroom, Officer Hudgins and his partner notified Lieutenant Steve Hammonds ("Lt. Hammonds"). At that point, Alister[5] and Defendant were both detained and placed in the back of patrol cars, which Officer Hudgins explained was standard policy designed to prevent flight and access to weapons. The officer further noted that once Lt. Hammonds arrived, he and Lt. Hammonds went outside to the patrol car in which Defendant was detained, where Lt. Hammonds advised Defendant of his *Miranda* rights and asked for consent to search the rest of the residence. Officer Hudgins testified Defendant gave verbal consent for the residence to be searched.

While Officer Hudgins did not observe anyone outside the home when he arrived, he testified that he observed Defendant's father, Michael Wright ("Mr. Wright"), outside the residence approximately 20-25 minutes later. Officer Hudgins testified that he does not recall ever seeing Mr. Wright inside the residence. Officer Hudgins explained at the time he believed Mr. Wright had been the third-party caller and listed him as such in his report. He did not recall

---

[4] Photographs of the bedroom and the items inside were entered as Government's Collective Exhibit 1. Officer Hudgins advised that the firearms had already been secured before the photos were taken so some items may have been slightly moved, but the photographs depicted the items very near the locations where they were initially observed.
[5] Alister was examined by EMS while still inside the residence, before being placed in the back of a patrol car.

Mr. Wright saying that he had been in the house before officers arrived, or that he had already taken Alister to the hospital that night.

Officer Hudgins explained that KPD officers do not wear body cameras and are required to wear microphones only during traffic stops, so neither he nor Officer Hutton was wearing either during this incident. KPD patrol cars are equipped with dashboard cameras, but those cameras only record when emergency lights are activated. Officer Hudgins testified that neither he nor Officer Hutton activated their emergency lights when responding to the overdose call, so the dashboard cameras were not on.[6] As a result, there is no recording of the interactions between Defendant and the officers.

### b. Testimony of Officer Sarah Hutton

Officer Sarah Hutton[7] began working for KPD on March 30, 2020, and has served as a patrol officer throughout her time with the department. She testified that she generally responds to calls involving drugs and overdoses at least once a week. Officer Hutton's testimony was largely consistent with that of Officer Hudgins. For instance, she also stated that she did not see anyone outside or near Defendant's home or the doorway to it when she arrived at the residence. She further echoed Officer Hudgins' statement that they did not draw their weapons when they approached the residence. Officer Hutton testified that Defendant answered the door alone. When Officer Hudgins explained to Defendant that they had received a call about a potential overdose, he advised that his brother had overdosed but was now okay and in bed asleep. She testified that Defendant seemed nervous about allowing officers access to the home but when they asked for

---

[6] KPD's policy now requires that emergency lights and sirens be engaged when officers are responding to an overdose call, but no such policy was in place at the time of this incident.

[7] Officer Hutton's name on the date of the incident in question was Sarah Meade. As such, documents related to the incident refer to Officer Hutton as Officer Meade and she was referred to as both Officer Hutton and Officer Meade during testimony.

permission to enter, he did permit them to come in to check on his brother. Defendant then led them to the bedroom where Alister was lying on the bed. Officer Hutton testified that she, too, understood from her training when responding to overdose calls that officers were to make direct contact with a reported overdose victim and ensure that he or she is examined by EMS. Officer Hutton testified that officers would not enter a residence without permission in this type of situation. She further explained that if officers are refused entry, they will ask for the victim to be brought outside, which she had personally done on other overdose calls.

Officer Hutton also testified about seeing a gun barrel sticking out from the edge of the blanket that was covering Alister. Additionally, she watched Alister get up from the bed after Officer Hudgins' instructed him to do so, and then saw Officer Hudgins secure the firearms which were fully revealed when Alistair got off the bed. Officer Hutton testified that at that point she instructed Alister to go to the den so EMS could check on him. After he left the bedroom, Officer Hutton observed drugs and drug paraphernalia in plain view on the bed.[8] After the scene had been secured, she then exited the residence and saw Michael Wright outside in the driveway. Officer Hutton did not speak to Mr. Wright and was unsure of the exact time of his arrival, but stated it was within the first hour officers were on the scene.

### c. Testimony of Lieutenant Steve Hammonds

Lt. Steve Hammonds is a 29-year veteran of KPD. On the date of the incident, Lt. Hammonds was serving as watch commander for the patrol platoon. He testified that his job entails overseeing all field activities in the absence of the chief of police and sometimes requires him to go into the field to assist officers. Lt. Hammonds has previously served as a patrol officer

---

[8] Officer Hutton testified that the photo introduced as Government's Exhibit 1B depicted items largely as they were when she and Officer Hudgins first entered the bedroom.

and detective and as a result has significant experience in working drug and overdose cases. Lt. Hammonds confirmed that at the time the incident at issue took place there was not a specific written policy in place on how to handle an overdose call, but that officers were trained to know that the best practice is to physically see the person in question to enable them to assess his or her condition and determine what medical attention might be needed. He further stated that officers should follow this practice even if another person has reported that the potential overdose victim no longer needs assistance. Lt. Hammonds also testified that when this incident took place there was no specific policy requiring officers to activate their microphones or cameras when conducting a welfare check, even if that welfare check turns into a criminal matter. He noted that while he was present at Defendant's residence, there were approximately four patrol cars on the scene that were equipped with dashboard cameras but advised that unless emergency lights were activated or the cameras were manually turned on, they would not have been recording. He explained that as a result, it is possible there is no recording of this incident.[9]

Lt. Hammonds testified that he originally came to Defendant's residence at 351 Sewanee Avenue on December 19, 2021, at approximately 2:05 a.m., because he received a call from Officer Hutton,[10] who advised him of the situation taking place at the residence. In providing that information, Officer Hutton gave Lt. Hammonds the names of Defendant and his brother. Lt. Hammonds then conducted a records check and determined that both had prior felony arrests. After obtaining this information, he proceeded immediately to the scene. Lt. Hammonds testified when he arrived, he observed Officer Luke Lawson standing near a patrol car searching

---

[9] The Court requested that KPD search its records to verify that there is no recording of the incident. The United States later filed a Notice [Doc. 27] advising that KPD Detective Mike Slater performed a diligent search and confirmed that no such video evidence exists.
[10] Lt. Hammonds referred to Officer Hutton as Officer Meade throughout his testimony; however, the Court will refer to her as Officer Hutton for consistency and clarity.

Defendant's person and observed Michael Wright standing in the driveway. Lt. Hammonds approached Mr. Wright and had a brief conversation, during which Mr. Wright advised him that Defendant and his brother were staying at the residence together. Lt. Hammonds further testified that Mr. Wright explained how he had come to the scene because he was advised that Alister was not doing well. The lieutenant noted that during their conversation Mr. Wright appeared appropriately concerned about the wellbeing of his son. Because it began raining, Lt. Hammonds and Mr. Wright walked inside the home to get out of the rain, and the two spoke for a few more moments once inside. Lt. Hammonds advised that he then made his way to the back bedroom on the right where Officers Hudgins and Hutton were located.

Lt. Hammonds recalled seeing a "long gun" and a baggie of suspected heroin when he entered the bedroom. At that point, he decided he needed to speak directly with Defendant and went back outside so he could do so. Defendant was being detained in a patrol car, and Lt. Hammonds testified that he and another officer went over to the patrol car to speak with Defendant. As best he could remember that officer was Officer Estepp, but he advised that it might have been Officer Hudgins instead.[11] Lt. Hammonds does not recall *Mirandizing* Defendant, and the fact that his written report of the incident does not state that he gave Defendant *Miranda* warnings leads him to believe that he did not. Through speaking with Defendant, Lt. Hammonds confirmed that Defendant lived at the residence and obtained Defendant's consent to search the residence. Lt. Hammonds stated there were no indications that Defendant did not understand the situation and Defendant never revoked his consent to the search. Upon obtaining Defendant's consent, Lt. Hammonds radioed officers inside the residence to advise they had received consent to search the entire residence. During the search, a large bag of hallucinogenic

---

[11] Lt. Hammonds wrote a statement regarding the incident on December 20, 2021, in which he stated he went to speak with Defendant with Officer Estepp.

mushrooms was discovered. At that point, Lt. Hammonds determined he needed to call in vice detectives. Lt. Hammonds explained that it is generally the role of detectives to collect evidence and process a scene, so after calling in vice detectives he left the residence.

### d. Testimony of Detective Mike Slater

The final witness for the United States was KPD Detective Mike Slater ("Det. Slater"), a veteran officer with 24 years of experience, six of which have been as a narcotics detective. Det. Slater testified that when arrived at the scene, he spoke to Officers Hudgins and Hutton, who explained that they had initially reported to the residence due to an overdose call. They further advised him that Defendant had allowed them to come into the residence where they then observed drugs, drug paraphernalia, and a gun in plain view. Det. Slater stated he was told that Defendant had given consent to search the residence, but he decided to get written consent as added assurance and to verify that the consent to search had not been revoked. By this time, Defendant had been transported to the Kingsport Jail. Det. Slater went to Kingsport Jail to speak with Defendant.[12] Det. Slater advised Defendant of his *Miranda* rights. Det. Slater testified that Defendant did not report any recent drug use and did not appear to be under the influence when he spoke with him. Det. Slater further stated that Defendant waived his *Miranda* rights during their conversation. Det. Slater then talked to Defendant about the search of Defendant's home which had already taken place. He referenced Defendant having given verbal consent to officers on the scene to conduct the search. Defendant made no statements to Det. Slater that would indicate that Defendant believed he had not actually given consent for the search. Defendant then signed a written consent form granting permission for his residence to be searched.[13] After

---

[12] Det. Slater's conversation with Defendant was recorded, and the video of this conversation was played during the suppression hearing and entered into evidence as Government's Exhibit 4.
[13] The signed consent form was introduced as Government's Exhibit 2. Alister Wright also signed a consent to search form, introduced as Government's Exhibit 3.

receiving Defendant's written consent to search, Det. Slater returned to the scene at approximately 4:00 a.m. and began collecting evidence.

### e. Testimony of Michael Wright

Michael Wright ("Mr. Wright"), Defendant's father, testified on Defendant's behalf. Mr. Wright testified that he was at work when he received a text message from Defendant at approximately 1:30 a.m. on December 19, 2021, stating that Alister had overdosed. Defendant also told Mr. Wright that he was scared to call an ambulance. Mr. Wright reported that he left work and went to Defendant's residence. He stated that although there were law enforcement officers at an intersection nearby, no law enforcement officers were present at Defendant's house when he arrived. Mr. Wright testified that Defendant brought Alister outside and Mr. Wright then put him into his car and drove him to the emergency room. Mr. Wright stated that during the drive to the emergency room Alister became more coherent and asked to be taken home. Mr. Wright claimed he and his son sat in his car outside the emergency room for approximately 15-20 minutes before he decided to take him back to Defendant's house to avoid incurring a large medical bill and because Alister promised he would seek drug treatment.

Mr. Wright testified that when they arrived back at Defendant's residence, Alister seemed fine and went to lay down in one of the bedrooms. He reported that he talked with Defendant in the kitchen for a while before deciding to leave to go back to work, but when he opened the door to leave, he saw two to three male police officers walking towards the house. Mr. Wright said the officers told him they had received a call about someone who could not breathe. He stated that he told the officers Alister was fine and believed he might have even told them that he had already taken Alister to the hospital. (Later in the hearing, Mr. Wright testified that he was sure he had shared this information with officers). Mr. Wright claimed that after his

exchange with the officers, they began speaking to Defendant at which point Mr. Wright says he walked outside because he was going to go back to work. Mr. Wright claimed that he was 2-6 feet away from Defendant and could see his interaction with officers but could not hear what was being said. He stated Defendant appeared to be standing in the door as though to block officers from entering the residence, but that they went in anyway, crossing the threshold of the residence without stopping. Mr. Wright testified that officers never knocked on the door because the door was open when they approached, and he did not hear Defendant give his consent for officers to enter or search the home. However, he also did not hear Defendant deny consent.

Mr. Wright reported several more officers arrived soon after, and when EMTs arrived he showed them to where Alister was lying down. Mr. Wright stated he observed officers searching the residence as he was directing EMTs to Alister. He testified that he went back outside, and a detective came to speak to him and told him law enforcement had found some things inside the residence and that both of his sons were going to jail. Mr. Wright stated he did not speak to any other officers and left about fifteen minutes after being so advised. He explained that he had intended to go back to work after leaving but because of everything that had happened, he was too upset to do so. When asked about why he did not stay, Mr. Wright explained that he believed it was his sons' responsibility to deal with the officers because it was their residence.

### f. Witness Credibility

When comparing the testimony of witnesses and evaluating credibility, some discrepancies in testimony are to be expected due to the individual perceptions of each witness and the passage of time. There are some such discrepancies between the testimony of Officer Hudgins, Officer Hutton, Lt. Hammonds, and Det. Slater; however, their testimony was largely

consistent. Further, the discrepancies that do exist are minor and are not material to the issue at hand. Therefore, the Court finds the testimony of Officer Hudgins, Officer Hutton, Lt. Hammonds, and Det. Slater to be credible.

The Court further recognizes that individual views are different and many times there is room to accept the truth found between even significantly differing versions of events. However, here, the Court cannot find room to accept the version of events provided by Mr. Wright during his testimony. In determining that it is necessary to largely reject his testimony, the Court first notes that Mr. Wright's claim that he was at the open door of Defendant's home when officers approached is entirely inconsistent with the testimony of Officers Hudgins and Hutton. The Court sees no reason that it would benefit the position of Officers Hudgins and Hutton to slant their testimony as to that issue. Additionally, Mr. Wright asserted that there were two to three officers who approached the door who were all male. There is objective evidence that Officer Hutton, a female, was one of the first two officers on the scene. Further, the timeframe offered by Mr. Wright does not square with the evidence. He stated that he first received a text from Defendant at about 1:30 a.m. Mr. Wright then had to leave work to travel to Defendant's home, at which time according to him Alister came out and got into his vehicle. The two then purportedly traveled to the hospital and remained in the parking lot for 15-20 minutes, and then returned to Defendant's residence, at which time he spoke with Defendant for a few minutes before he claims officers arrived. Yet, Officer Hudgins testified that he and Officer Hutton arrived on the scene about five to ten minutes after receiving a call at 1:40 a.m. and Lt. Hammonds testified that he arrived at approximately 2:05 a.m., when officers had already been on the scene long enough to talk with Defendant and proceed inside to check on Alister, at which time they observed illegal items in plain view and contacted the lieutenant. In other words, it is

impossible to square the timeframe offered by Mr. Wright with that testified to by the officers. Officers would have had no motive to testify untruthfully about the time of day the events at issue took place.

Additionally, the Court must note that other points of Mr. Wright's testimony are simply illogical, such as his report that he was between 2 and 6 feet from Defendant and officers but was unable to hear any of their conversation. Another example of the challenges presented by his testimony is Mr. Wright's claim that he drove Alister to the hospital but did then chose not to take him inside because his son promised to seek drug treatment seems highly improbable given that when Defendant texted him sharing his grave concerns about Alister's condition, Mr. Wright was concerned enough to leave work mid-shift. Additionally, there was Mr. Wright's willingness to shift his testimony during the hearing about the information he shared with officers about this alleged trip to the hospital. He initially testified that he thought he might have shared that information with officers but later in his testimony he was sure that he had done so. The Court further finds it almost impossible to reconcile Mr. Wright's testimony that he was on the scene as a concerned father when officers arrived at the residence with his testimony that he left Defendant to deal with the officers alone without even remaining within earshot of the conversation. Finally, the Court is unable to reconcile Mr. Wright's testimony that he remained at the premises as a concerned father with his decision to leave after he learned that his sons were going to jail, despite the fact that his sons were still on the premises.

### III. ANALYSIS

The Fourth Amendment creates "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well settled that a person may waive his Fourth Amendment rights by consenting to a

search." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). Such consent must be given freely and voluntarily. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'" *Carter*, 378 F.3d at 587 (quoting *Schneckloth v. Bustamante*, 412 U.S. 218, 227 (1973)). Consent is not voluntary when it is obtained through "duress, coercion, [or] trickery." *Id.* at 588 (quoting *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981)). Additionally, once entry into a residence is authorized, the Fourth Amendment does not protect items that are observed in plain view and immediately appear to be evidence from seizure. *United States v. McLevain*, 310 F.3d 434, 438-39 (6th Cir. 2002).

The evidence here has established that Defendant freely and voluntarily gave officers consent to enter his residence. Officers Hudgins and Hutton truthfully informed Defendant of the receipt of a call reporting an overdose and requested permission to enter to check on his brother and make sure he was okay. While officers did state that they had to see Alister before leaving, they were not threatening, coercive or deceitful in their interaction with Defendant about the issue. Additionally, Officer Hutton specifically advised that when officers had been refused admittance to a home when responding to other similar calls the officers had offered for the alleged victim to be brought outside. Here, that was not necessary because Defendant permitted entry. Defendant did not appear to be under the influence or incapable of understanding the officers' request and was competent to give the consent he granted. Also of note is that Defendant was not the target of officers' initial inquiry.[14]

---

[14] Even if the Court found the testimony of Defendant's father fully credible, Mr. Wright still did not recount any events or statements made by officers that would amount to coercion, deceit, or trickery, nor that Defendant refused officers permission to enter. In fact, given that Mr. Wright testified that he was within 2-6 feet of Defendant when officers initially spoke with him, had they spoken to him in a hostile or coercive tone it would

Had the Court found that officers pushed their way inside the residence after Defendant denied them entry, it would be necessary to undertake an analysis of whether exigent circumstances were present which would have permitted forced entry; however, here, the evidence presented supports the conclusion that Defendant gave consent, rendering an exigent circumstances analysis unnecessary.[15] Officers readily admitted that Defendant was inquisitive and initially somewhat hesitant about granting entry but after they further discussed with him their need to lay eyes on Alister, he voluntarily permitted their entry into the home. Importantly, at no time did officers have their guns drawn while interacting with Defendant. Given the evidence presented, the Court finds that Defendant freely and voluntarily allowed Officers Hudgins and Hutton to enter his residence. Once inside the residence, Officers Hudgins and Hutton observed illegal items in plain view. Under the plain view doctrine, such items, including firearms and narcotics were subject to seizure. *See McLevain*, 310 F.3d at 438-39.

Further, after illegal items were observed in plain view, Lt. Hammonds obtained Defendant's verbal consent to search the remainder of the residence. Once again, the totality of the circumstances establishes that this consent was given voluntarily. While Defendant was being detained when consent to search the home was requested, there is no evidence to indicate that Defendant was threatened in any way or misled by officers to believe they had the right to search his home without his consent. Finally, in addition to verbal consent, Defendant also consented to a search of his home by signing a written waiver, albeit after the search had already taken place. While the Court finds the written post-search consent itself is of little import, Det. Slater's conversation with Defendant to obtain it is of assistance in evaluating the issue of

---

have been impossible for him not to have heard it. Additionally, Mr. Wright did not testify that officers forced their way inside.

[15] Had this been the case, entry would likely have been permissible under the exigent circumstances exception to the warrant requirement. *See Stricker v. Twp. Of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013).

consent. During that conversation, Det. Slater referenced the verbal consent to search that Defendant had provided earlier. While Defendant could have contested the accuracy of Det. Slater's statement, he did not do so. Instead, the conversation that took place indicates that Defendant concurred with Det. Slater's statements, a finding which is further supported by Defendant's willingness to execute the written consent to search form.

In summary, after considering all evidence presented, the Court finds that the initial entry into Defendant's residence and the subsequent search thereof was undertaken with Defendant's consent and was not in violation of the Fourth Amendment. As such, the evidence obtained after officers entered Defendant's home, including the statements made by Defendant and Alister Wright, is not tainted and should not be suppressed.

## IV. CONCLUSION

For the reasons outlined above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 14] be **DENIED**. [16]

Respectfully Submitted,

/s/Cynthia Richardson Wyrick
United States Magistrate Judge

---

[16] Any objections to this report and recommendation must be served and filed within **fourteen (14) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).